[Crim. No. 1274. Department One.—December 21, 1906.]

THE PEOPLE, Respondent, v. THORNTON D. CONNESS, Appellant.

CRIMINAL LAW—ALLOWING WIFE IN HOUSE OF PROSTITUTION—SUFFICIENCY OF INFORMATION — LANGUAGE OF STATUTE — INTENT OF PROSTITUTION NOT INCLUDED.—An information following the words of the statute of 1891 (Stats. 1891, p. 285) and charging that defendant did willfully, unlawfully, and feloniously ''connive at, consent to, and permit the placing and leaving'' of his wife ''in a house of prostitution,'' specified, and did in like manner ''allow and permit his said wife to remain in a house of prostitution,'' is sufficient, and need not aver the facts not embodied in the statute, that she became a prostitute therein nor that there was an intent on his part that she should do so.

ID.—OTHER OCCUPATION IN BAWDYHOUSE—REASONABLENESS OF STATUTE—PUBLIC POLICY.—Though there is no moral turpitude *per se* in the occupation of cook, seamstress, or housemaid, yet it is not absurd or unreasonable or an undue restriction of the right to labor to forbid a husband from placing or leaving his wife or allowing her to remain in such occupation in a bawdyhouse, which is a place of the utmost moral pollution and social degradation, the existence and continuance of which a sound public policy and the avowed policy of the law requires should be discouraged and prevented. Such restrictions are in harmony with other restrictions upon bawdyhouses in the Penal Code and consistent with the public policy which they are intended to enforce.

ID.—DEGREE OF PUNISHMENT—FELONY—MISDEMEANORS—LEGISLATIVE DISCRETION—CONSTITUTIONAL LAW.—Although the offense in question is made a felony, with the possible punishment of ten years in the state prison, while other offenses in bawdyhouses are made misdemeanors only, yet this inconsistency, conceding it to be such, is purely a matter of legislative judgment and discretion; and in view of the evils which this statute aims to prevent, and the large discretion of the legislative department of the state in such matters

of policy, it cannot be said that this statute is in conflict with the prohibition of the constitution against the infliction of cruel and unusual punishment.

ID.—EVIDENCE FOR DEFENSE—PROVINCE OF JURORS—IMPROPER REFUSAL OF INSTRUCTION.—Where there was evidence for the defense that he was anxious to have his wife leave the bawdyhouse, and tried to induce her to do so, the credibility of such evidence was within the exclusive province of the jurors; and it was error to refuse an instruction to the effect that if the jury found from the evidence that no other facts were established in the case than that defendant was a married man whose wife resided in a house of prostitution, and that defendant knew that she was residing therein, they should permit no presumption of law against defendant from these facts, and it was their duty under the law to acquit him.

ID.—CONSTRUCTION OF STATUTE—MEANING OF ''ALLOW.''—The word ''allow'' used in the statute means more than mere ''abstinence from prevention,'' as defined by the court in instructing the jury. It has almost the identical meaning of the word ''permit,'' also used in the statute, and implies some sort of assent, active wish, or at least willingness, in his mind after he has knowledge of. her presence in the bawdyhouse that she should continue there; something more than mere indifference to her whereabouts, or passive sufferance, in a case where the circumstances do not call upon him to interfere with her conduct. If he did not, in the first instance, directly or indirectly connive at, consent to, or permit of her going there, he must to some extent be an accomplice to her remaining there after he has knowledge of the fact.

ID.—CONFUSING PART OF INSTRUCTION—DUTY AS TO PRESUMPTION OF LAW.—That portion of the instruction refused, that ''it is still your duty to permit no presumption of law from these facts to be raised against the defendant,'' though technically true, renders the instruction somewhat confusing, and might well have been eliminated, though it does not, in connection with the other parts of the instruction, render it erroneous as a whole.

ID.—CROSS-EXAMINATION OF WITNESS FOR PROSECUTION—GENERAL QUESTIONS—DISCRETION OF COURT.—The court had discretion to refuse to allow general questions by the defendant on cross-examination of witnesses for the prosecution, as to whether or not they had previously talked with certain persons about their testimony, without any definite aim or disclosure of any specific statement of the witness inconsistent with his testimony, or of any declaration or conduct affecting his motive or showing bias. There must be a very clear and flagrant abuse of the discretion of the court in restricting a cross-examination, and apparent injury therefrom, to justify this court in reversing a case on account of it.

APPEAL from a judgment of the Superior Court of Fresno County, and from an order denying a new trial. H. Z. Austin, Judge.

The facts are stated in the opinion of the court.

Ewing, Thompson & Prince, for Appellant.

U. S. Webb, Attorney-General, and Geo. W. Jones, District Attorney, for Respondent.

SHAW, J.—The information in this case charges that the defendant did "willfully, unlawfully, and feloniously connive at, consent to and permit the placing and leaving of one Mary L. Conness, who was then and there the wife of him, the said Thornton D. Conness, in a house of prostitution, known as the 'Diamond Palace,' situate at the corner of Tulare and E sts., in the City of Fresno, and did then and there willfully and unlawfully and feloniously allow and permit his said wife to remain in said house of prostitution; contrary," etc. The defendant was tried and convicted on this charge and was sentenced to a term of six years in the state prison. He appeals from the judgment and from an order denying his motion for a new trial.

The first point presented on the appeal from the judgment is that the information does not charge a public offense. The defect asserted is that it fails to aver that the acts of the defendant were done with the intent, on his part, that his wife should devote herself to prostitution while she was in the house in which he had placed her and permitted her to remain. It is argued that a woman may be in a bawdyhouse as a cook, seamstress, or housemaid, without herself engaging in the practice of prostitution, and that the statute, according to what is claimed to be its true effect and purpose, does not forbid a husband to place or leave his wife in such a house, or to allow her or permit her to remain therein, unless she there becomes a prostitute, nor unless he intends that she shall do so. The information follows the words of the statute, which are as follows:—

"Any man who by force, fraud, intimidation, threats, persuasions, promises, or any other means, places or leaves, or procures any other person or persons to place or leave his wife in a house of prostitution, or connives at, consents to, or permits the placing or leaving of his wife in a house of prostitution, or allows or permits his wife to remain therein,

shall be guilty of a felony, and upon conviction thereof shall be imprisoned in the state prison for not less than three years nor more than ten years.'' (Stats. 1891, p. 285.)

There is nothing in the language of this statute which expresses the idea that the wife must be placed or allowed to remain in the house for the purpose of having her engage in prostitution therein. If such element constitutes a necessary part of the offense, it must be read into the statute by some process of constructive interpretation. We do not think it was so intended. The fact that no words expressing that idea are inserted in the statute, when a very few words would have sufficed for that purpose, is a strong indication of the legislative intent that the offense should be complete without it. It is indeed conclusive on that point, unless there is something in the nature of the acts described as constituting the offense, or in the circumstances attending them, which requires the court in construing the language to disregard the ordinary meaning of the words and add a thought not expressed thereby,—something which makes its literal meaning so absurd or unreasonable as to compel the conclusion that the legislature could not have so intended it. Nothing producing this effect appears.

There is, it is true, no moral turpitude in the occupation of cook, seamstress, or housemaid. All are honorable vocations which every female has a legal right to pursue, and they are entirely consistent with virtue, chastity, and refinement. But it by no means follows that it would be absurd or unreasonable, or an undue restriction of the right to labor, to forbid a husband from placing or leaving his wife in such a place, or from allowing her to remain there, for the purpose of engaging in such innocent occupation. It would not be unreasonable or absurd, or an undue restriction of personal liberty, to forbid all persons from remaining in a bawdyhouse, nor to forbid any person from allowing, or permitting another to remain there, in the sense in which the words ·''allow'' and ''permit'' are used in this statute.

A bawdyhouse is a place of the utmost moral pollution and social degradation. It is a well-known fact that such places, though perhaps to some extent inevitable, are among the most serious and threatening of the dangers to the physical and moral well-being of the human race. A sound public policy

requires that their existence and continuance should be dis-couraged, discountenanced, and prevented by all possible legal means. This is the avowed policy of the law. By the Penal Code it is made a misdemeanor to keep such a place, or to reside therein (sec. 315) ; or to let an apartment or tenement, knowing that it is to be used for such purpose (sec. 316) ; or to admit a minor of either sex thereto for any purpose whatever, or for any parent or guardian of such minor to sanction or connive at the admission of a minor to any such house or to any room thereof (sec. 309) ; or, by invitation or device, to prevail upon any person to visit such a house, re-gardless of the purpose of such visit (sec. 318) ;. or for any person having messengers for hire to send any minor engaged in such work to serve any inmate of such house or to enter the same (sec. 273e) ; or; except in the case of a California Indian, to live in or about such house for any purpose (sec. 647).

The provision that a husband shall not allow or permit his wife to remain in a house of that character, even to engage in an innocent or otherwise useful occupation therein, is in complete harmony with these restrictions, and is entirely con-sistent with the public policy which they are intended to enforce.

There are good reasons for the view that the legislature intended the statute to be effective according to its literal im-port. Vice is contagious, and environment is usually potent in forming or influencing character. It is almost impossible that a chaste woman should long remain in such vile surround-ings without herself becoming vile. No woman decent at heart would submit to it for a moment except from the direst necessity. It may have been the purpose to protect married women from exposure to such influences by forbidding the assent of . a sordid or vicious husband to her presence there for any purpose. Again, it is inconceivable that a husband would with a willing mind assent that his wife should become an inmate of a house of ill-fame for any purpose, unless he intended or expected that she should be a prostitute therein. Any claim that she was there for any decent purpose would, in the vast majority of cases, be the merest pretense to cover the real purpose. The exceptions would be so few and so unworthy as to require no consideration or protection from

the law. Nevertheless, owing to the depraved character of
those who would usually be the only persons cognizant of the
facts, and the inherent difficulties of obtaining other than
inferential evidence of the facts of intent and of actual pros-
titution, it would be difficult to prove them to the satisfaction
of a jury beyond reasonable doubt if they were made neces-
sary to constitute the crime. And yet both facts would almost
invariably exist in every such case, where the relations be-
tween the spouses were harmonious. Proof of the facts that
a wife inhabits a house of ill-fame and that the husband
consents, or willingly suffers it, would create a strong infer-
ence, almost amounting to a presumption, that she is unchaste
and that he intends that she shall be. To require averment
of these facts, which practically always accompany those
mentioned in the statute, would not only tend to some extent
to encourage such places by permitting married women to
work therein, but, by making convictions much more difficult
in every case, it would also often serve to defeat the purpose
of the statute, so far as it was really intended to prevent a
vile husband from profiting by the prostitution of his wife.
The legislature may have believed that such purpose could
best be accomplished by the absolute inhibition of a life by
the wife in such a place with the assent of the husband, even
for an innocent purpose, or at least by providing that his
intentions as to her conduct while remaining therein should
be immaterial in averring or proving the offense.

It may be suggested that the making of such acts a felony,
with the severe punishment of ten years' imprisonment in the
state prison which the law authorizes, puts it out of harmony
with the other statutes above referred to, which make acts of
similar character misdemeanors only, with a comparatively
slight punishment. This inconsistency, conceding it to be
such, is purely a matter of legislative judgment and discre-
tion, and it does not render the literal effect of the statute
under consideration so unreasonable or absurd as to require
a different interpretation. The degree of the offense and the
severity of the punishment to be imposed are subjects for the
legislative determination, and usually have but little bearing
on the question of the interpretation of the law, but are to
be considered chiefly upon the question whether or not the
punishment is so severe that it violates the prohibition of the

constitution against the infliction of cruel and unusual punishment. In view of the evils which the statute aims to suppress, and the large discretion of the legislative department of the state in such matters of policy, it cannot be said that this statute is in conflict with this provision of the constitution.

We are of the opinion that the information sufficiently charges a public offense, under the statute above quoted, and that it is not necessary in a prosecution for such offense to allege or prove either that the wife followed the practice of prostitution after becoming an inmate of the house or that the husband intended that she should.

It is freely admitted that there may be cases where a wife may visit such a house with the consent of her husband and in which he would not be guilty of any offense under this statute; as, for instance, if she goes for charitable purposes, or to induce the inmates thereof to reform. No difficulty would be found in disposing of such cases, even if we may imagine that some prosecutor will be inveigled into charging such a person with crime, or foolish enough to do so with full knowledge of the circumstances. It would be a case for the application of the old rule whereby a surgeon who attended to the duty of bleeding a sick person in the streets was held to be not guilty of a violation of the law which in express terms made it a crime to let blood in the street.

The following instruction was asked by the defendant and refused by the court: ''You are further instructed that if you find from the evidence, beyond all reasonable doubt and to a moral certainty, that the defendant in this case was a married man, that his wife resided in a house of prostitution, and that this said defendant knew that she was residing therein, it is still your duty to permit no presumption of law from these facts to be raised against this defendant, and if no other facts are established in this case except the foregoing, it is your duty under the law to acquit this defendant.''

We are of the opinion that the defendant was entitled to have this instruction given. There was much evidence in his behalf to the effect that he was anxious to have her leave the house, and that he tried in various ways to induce her to abandon the life she was leading. A good deal of it was not of a character to inspire belief. But this was a matter within the

exclusive province of the jurors, and it may be that if they had been instructed as requested they would have considered that there was a reasonable doubt that the defendant had anything to do with the presence of his wife in the house, or of his willingness that she should remain therein, or that they would have been in such reasonable doubt in regard to whether any facts were established, except that she was his wife and that she resided in a bawdyhouse with his knowledge. If such was their view of the evidence they should have returned a verdict of acquittal. The statute is in the disjunctive and it declares that if the husband shall "allow" his wife to remain in a house of prostitution he is guilty of a felony. The word "allow" here means more than mere "abstinence from prevention," as the court below defined it in an instruction given to the jury. It has almost the identical meaning of the word "permit", also used in the statute. It implies some sort of assent on the part of the husband. There must be some active wish, or at least willingness, in his mind, after he has knowledge of her presence in the house, that she should continue there; something more than mere indifference to her whereabouts or passive sufferance in a case where the circumstances do not call upon him to interfere with her conduct. Where he does not, directly or indirectly, place or leave her in the house, or connive at, consent to, or permit of her going there (using the word "permit" in the same sense which we attribute to the word "allow"), he must, to some extent, be an accomplice in her remaining there, after he has knowledge of the fact. The defendant was entitled to an affirmative statement from the court such as that contained in the instruction refused. There is nothing in the instructions given which could serve as a substitute for this instruction. On the contrary, the definition of the word "allow" given by the court implies that the defendant could be guilty although he did not wish his wife to remain in a house of prostitution, had nothing to do with her going there, and was a party to her being there only by reason of the fact that he took no active steps to remove her therefrom. The instruction as asked is rendered somewhat confusing, and certainly less clear, by the interpolation of the phrase "it is still your duty to permit no presumption of law from these facts to be raised against this defendant." Although this statement is tech-

nically true, it might well have been eliminated from the instruction. It does not, however, in connection with the other parts of the instruction, render it erroneous as a whole.

Complaint is made that the court unfairly restricted the cross-examination of the witnesses for the prosecution by refusing to allow general questions as to whether or not they had previously talked with certain persons about their testimony. This is a subject upon which the trial court has much discretion, and usually its exercise of the discretion will not be interfered with on appeal. In the present case, it did not appear that counsel had in view the disclosure of any specific statement of the witness inconsistent with his testimony, or of any declaration or conduct affecting his motive, or showing interest or bias. It appeared that the questions were asked without definite aim, and in the mere hope that by repeated questions something of value to the defendant might be elicited. The court properly refused to allow such a course. A trial is not had for the purpose of allowing the defendant an opportunity to discover evidence in his behalf, but to enable him to produce such evidence as he may desire. If counsel, in good faith, had the expectation that the questions would elicit impeaching testimony, they must or should have known something of its character, and they should have stated to the court, specifically, what they expected in that regard. The court may, in its discretion, allow such questions without a previous declaration, where it appears that the declaration may serve to warn an unfair witness in time to allow him to prepare his answer, but it may also refuse to do so, in its discretion. There must be a very clear and flagrant abuse of this discretion, and a positive and apparent injury therefrom, to justify this court in reversing a case on account of it. Many other exceptions are noted in the record and discussed to some extent in the briefs, but they are of slight importance and we deem it unnecessary to consider them.

The judgment and order are reversed and the cause remanded for a new trial.

Angellotti, J., and Sloss, J., concurred.